**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _5/20/20_

---

FEDERAL TRADE COMMISSION,

    Plaintiff,

v.

FIRST DATA MERCHANT SERVICES
LLC, a limited liability company, and

CHI W. KO, a/k/a Vincent Ko,

    Defendants.

---

Case No.    1:20-cv-3867

**STIPULATED ORDER**

## STIPULATED ORDER FOR PERMANENT INJUNCTION AND MONETARY JUDGMENT AS TO FIRST DATA MERCHANT SERVICES LLC

Plaintiff, the Federal Trade Commission ("Commission" or "FTC"), filed its Complaint for Permanent Injunction and Other Equitable Relief ("Complaint") against Defendant First Data Merchant Services LLC ("First Data") pursuant to Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101–6108. The Commission and Defendant stipulate to the entry of this Stipulated Order for Permanent Injunction and Monetary Judgment, ("Order") to resolve all matters in dispute in this action between them.

THEREFORE, IT IS ORDERED as follows:

### FINDINGS

1.    This Court has jurisdiction over this matter.

2.    The Complaint charges that Defendant participated in deceptive and unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, the Telemarketing Act,

15 U.S.C. §§ 6101–6108, and the Telemarketing Sales Rule ("TSR") 16 C.F.R. Part 310, by processing or arranging for processing charges to consumers' credit and debit cards for Covered Clients.

3. Defendant neither admits nor denies any of the allegations in the Complaint, except as specifically stated in this Order. Only for purposes of this action, Defendant admits the facts necessary to establish jurisdiction.

4. Defendant waives any claim that it may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Order, and agrees to bear its own costs and attorney fees.

5. Defendant and the Commission waive all rights to appeal or otherwise challenge or contest the validity of this Order.

**Definitions**

For the purpose of this Order, the following definitions apply:

A. **"ACH Debit"** means any completed or attempted debit to a Person's account at a Financial Institution that is processed electronically through the Automated Clearing House Network.

B. **"Acquirer"** means a business organization, Financial Institution, or an agent of a business organization or Financial Institution that has authority from an organization that operates or licenses a credit card system (*e.g.*, Visa, Inc., Mastercard, Inc., American Express Company, and Discover Financial Services, Inc.) to authorize Merchants to accept, transmit, or process payment by credit card through the credit card system for money, goods or services, or anything else of value.

C.      "**Acquiring Bank**" means a Financial Institution that is a member or direct client of a card network which has the primary obligation under the card network rules to enter into agreements with Merchants and to be financially responsible under the card network rules for the activity of Merchants.

D.      "**Card-Not-Present Transaction**" means a debit or credit card transaction whereby the Person's debit or credit card is not physically dipped, swiped, scanned, or imprinted.

E.      "**Chargeback**" means a procedure whereby an issuing bank or other Financial Institution charges all or part of an amount of a Person's credit or debit card transaction back to the acquiring or merchant bank.

F.      "**Chargeback Rate**" means the proportion (expressed as a percentage) of Chargebacks out of the total number of credit or debit card sales transactions.

G.      "**Client**" means (a) any Person who obtains, directly or indirectly, from Defendant a Merchant Account or (b) any Merchant to whom Defendant provides Payment Processing services.

H.      "**Covered Client**" means any Client who applies for or obtains, directly or indirectly, a Merchant Account through a Wholesale ISO.

I.      "**Defendant**" means First Data Merchant Services LLC f/k/a First Data Merchant Services Corporation, and its successors and assigns.

J.      "**Financial Institution**" means any institution the business of which is engaging in financial activities as described in section 4(k) of the Bank Holding Company Act of 1956 (12

U.S.C. § 1843(k)).  An institution that is significantly engaged in financial activities is a Financial Institution.

K.      "**Home-Based Internet Business Program**" means a program, system, or plan marketed with representations, expressly or by implication, to train or teach a consumer to establish or operate a home-based internet business, *provided, however,* "Home-based Internet Business Program" shall not include: (1) courses offered by accredited schools, colleges or universities, or non-profit organizations, or (2) e-commerce platforms available to broad categories of merchants, where the training or teaching is an incidental support service for use of the e-commerce platform.

L.      "**Independent Sales Organization**" or "**ISO**" means any Person that (1) enters into an agreement or contract with Defendant to sell or market Payment Processing services to a Merchant; (2) matches, arranges for, or refers Merchants to Defendant for Payment Processing services, or that matches, arranges for, or refers a Payment Processor or Acquirer to Merchants for Payment Processing services; or (3) is registered as an ISO or merchant service provider with Visa, Mastercard, or any credit card network.

M.      "**Merchant**" means a person who is authorized under a written contract with a Payment Processor to honor or accept credit cards, or to transmit or process for payment credit card payments, for the purchase of goods or services or a charitable contribution.

N.      "**Merchant Account**" means an account associated with a Merchant which is maintained on Defendant's computer systems and established on behalf of a Wholesale ISO which enables the Merchant to obtain Payment Processing services.

O.     **"Negative Option Feature"** means, in an offer or agreement to sell or provide any product or service, a provision under which the consumer's silence or failure to take an affirmative action to reject products or services or to cancel the agreement is interpreted by the Client, seller or Merchant as acceptance of the offer. Offers or agreements with Negative Option Features include, but are not limited to: (a) free or introductory price trial offers in which the consumer receives a product or service for free or at a nominal or introductory price for an initial period and will incur an obligation to pay or pay a greater amount for the product or service if he or she does not take affirmative action to cancel, reject, or return the product or service before the end of that period; (b) continuity plans in which, subsequent to the consumer's agreement to the plan, the seller or provider automatically ships products to a consumer unless the consumer notifies the seller or provider within a certain time not to ship the products; and (c) automatic renewal plans in which the seller or provider automatically renews the agreement and charges the consumer unless the consumer cancels before the renewal.

P.     **"Payment Processing"** means providing a Person, directly or indirectly, with the means used to charge or debit accounts through the use of debit, credit, prepaid or stored value cards or similar device issued under the authority or license of any card network. Whether accomplished through the use of software or otherwise, Payment Processing includes, among other things: (1) reviewing and approving Merchant applications for payment processing services; (2) providing the means to transmit sales transaction data from Merchants to Acquirers or other Financial Institutions; (3) clearing, settling, or distributing proceeds of sales transactions from Acquirers or Financial Institutions to Merchants; or (4) processing Chargebacks.

Q.     **"Payment Processor"** means any Person providing Payment Processing services in connection with another Person's sale of goods or services, or in connection with any charitable donation.

R.     **"Person"** means any natural person or any entity, corporation, partnership, or association of persons.

S.     **"Remotely Created Payment Order"** or **"RCPO"** means a payment instruction or order, whether created in electronic or paper format, drawn on a payer's account that is initiated or created by or on behalf of the payee, and which is deposited into or cleared through the check clearing system. For purposes of this definition, an account includes any financial account or credit or other arrangement that allows checks, payment instructions, or orders to be drawn against it that are payable by, through, or at a bank.

T.     **"Restricted Client"** means any Covered Client who offers to sell, sells, promotes, or markets the following goods or services: Home-Based Internet Business Programs; debt consolidation or reduction services; or nutraceuticals with a Negative Option Feature.

U.     **"Sales Agent"** means a Person that matches, arranges, or refers prospective Clients or Clients to a Payment Processor or ISO for Payment Processing, but does not hold any contractual liability in the event of losses related to the Payment Processing activities conducted by or on behalf of Clients.  As such, a Sales Agent may be involved in recommending a particular Payment Processor or ISO to a prospective Client, forwarding to the Payment Processor or ISO a prospective Client's or Client's merchant application, or

negotiating rates and fees charged by a Payment Processor or ISO, but a Sales Agent may not be involved in any Payment Processing and may not act as an ISO.

V.      **"Telemarketing"** means any plan, program, or campaign which is conducted to induce the purchase of goods or services by use of one or more telephones, and which involves a telephone call, whether or not covered by the TSR.

W.      **"Total Return Rate"** means the proportion (expressed as a percentage) of all attempted ACH Debit or RCPO transactions that are returned through the banking system for any reason, whether before or after payment, out of the total number of such attempted transactions, calculated separately for each transaction type.

X.      **"Wholesale ISO"** means any ISO that: (a) pursuant to a tri-party agreement with respect to Payment Processing activities among the Wholesale ISO, the Defendant and an Acquiring Bank, holds contractual liability to the Acquiring Bank and Defendant in the event of credit or fraud losses related to the failure of a Merchant to meet its obligations to the Cardholder, and (b) has primary contractual responsibility for underwriting Merchants and monitoring their transactional activity pursuant to such tri-party agreement, regardless of whether the Wholesale ISO performs such activities, itself, or through a service provider, and (c) where Defendant is obligated to the Acquiring Bank for any failure by the ISO to fulfill its obligations, *provided that* "Wholesale ISO" shall not include organizations that are registered with one or more card networks as payment facilitators, or marketplaces.

## I.

## PROHIBITIONS RELATED TO MERCHANT ACCOUNTS

IT IS ORDERED that Defendant, Defendant's officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from:

A.      Making, or assisting others in making, expressly or by implication, any false or misleading statement in order to obtain Payment Processing services; and

B.      Engaging in any tactics to avoid fraud and risk monitoring programs established by any Financial Institution, Acquirer, or the operators of any payment system, including, but not limited to, balancing or distributing sales transaction volume or sales transaction activity among multiple Merchant Accounts or merchant billing descriptors; splitting a single sales transaction into multiple smaller transactions; or using shell companies to apply for additional Merchant Accounts.

## II.

## PROHIBITION AGAINST ASSISTING AND FACILITATING

IT IS FURTHER ORDERED that Defendant, Defendant's officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from providing substantial assistance or support to any Person in connection with Payment Processing:

A.      That they know, or consciously avoid knowing, is violating the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310; or

B.      Where such assistance or support constitutes an unfair or deceptive act or practice prohibited by Section 5 of the FTC Act.

## III.

## SCREENING OF PROSPECTIVE RESTRICTED CLIENTS

IT IS FURTHER ORDERED that Defendant, Defendant's officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from participating in Payment Processing for any prospective Restricted Client without first engaging in a reasonable screening of the prospective Restricted Client to determine whether the prospective Restricted Client's business practices are, or are likely to be, deceptive or unfair within the meaning of Section 5 of the FTC Act, or violation of the Telemarketing Sales Rule. Such reasonable screening shall include, but not be limited to:

A.      Establishing and maintaining policies and procedures designed to identify prospective Merchants who may seek to become Restricted Clients;

B.      Where Defendant receives information that a Merchant may be a prospective Restricted Client, obtaining from each prospective Restricted Client, including the principal(s) and controlling Person(s) of the entity, any Person(s) with a majority ownership interest in the entity, and any corporate name, trade name, fictitious name or aliases under which such Person(s) conduct or have conducted business:

1.      A description of the nature of the prospective Restricted Client's business, including describing the nature of the goods and services sold and methods of sale, for which the prospective Restricted Client seeks Payment Processing services;

2.      The name of the principal(s) and controlling Person(s) of the entity, and Person(s) with a majority ownership interest in the entity;

3. A list of all business and trade names, fictitious names, DBAs, and Internet websites under or through which the prospective Restricted Client has marketed or intends to market the goods and services for which the prospective Restricted Client seeks Payment Processing services;

4. Each physical address at which the prospective Restricted Client has conducted business or will conduct the business(es) identified pursuant to subsection (1) of this Section III.B;

5. The name and address of every Acquirer, originating depository Financial Institution (if Defendant proposes to provide Payment Processing services for ACH Debit or RCPO transactions), and Payment Processor used by the prospective Restricted Client during the preceding twelve (12) months, and all merchant identification numbers used by any such banks or Payment Processors in connection with the prospective Restricted Client;

6. The prospective Restricted Client's past monthly Chargeback Rate and Total Return Rate (if Defendant proposes to provide Payment Processing services for ACH Debit or RCPO transactions) for the preceding twelve (12) months, and estimates of future Chargeback Rates and Total Return Rates (if Defendant proposes to provide Payment Processing services for ACH Debit or RCPO transactions);

7. The names of trade and bank references; and

8. Whether the prospective Restricted Client, including the principal(s) and controlling Person(s) of the entity, any Person(s) with a majority ownership interest in the entity, and any corporate name, trade name, fictitious name or aliases under which such Person(s) conduct or have conducted business, has ever been:

      i.     placed in a payment card association's chargeback monitoring program; or

     ii.    the subject of a complaint filed by the Commission or any other state or federal law enforcement agency; and

C.    Taking reasonable steps to assess the accuracy of the information provided pursuant to Section III.B. of this Order, including but not limited to: reviewing the Internet websites used by the prospective Restricted Client to market its goods or services; obtaining and reviewing copies of monthly Payment Processing statements issued by any bank, ISO, Sales Agent, Acquirer, or Payment Processor used by the Restricted Client during the preceding six (6) months; and obtaining and reviewing a representative sample of current marketing materials for each good or service related to the offer for which Defendant would provide the prospective Restricted Client with Payment Processing services.  The purpose of such steps is to determine whether the prospective Restricted Client is engaged in any of the following acts or practices, in which case Defendant shall not provide Payment Processing for the prospective Restricted Client:

1.    Failing to clearly and conspicuously disclose all products and services that are sold in conjunction with the offered product or service, and the total cost to purchase, receive, or use, any products or services that are the subject of the sales offer;

2.    Misrepresenting any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of the sales offer;

3.    Failing to clearly and conspicuously disclose all material terms and conditions of an offer;

Case 1:20-cv-03867-LLS   Document 11-1   Filed 05/20/20   Page 12 of 36

4.      Misrepresenting, expressly or by implication, any material aspect of the prospective Restricted Client's refund, cancellation, exchange, or repurchase policies; and

5.      Causing billing information to be submitted for payment without the customer's express authorization.

## IV.

## MONITORING OF RESTRICTED CLIENTS

IT IS FURTHER ORDERED that Defendant, Defendant's officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with Payment Processing are permanently restrained and enjoined from:

A.      Failing to perform reasonable due diligence within 120 days after the effective date of this Order (unless extended by the Associate Director for Enforcement for good cause) to identify existing Restricted Clients ("Legacy Restricted Clients"), if any;

B.      Following the 120-day period referenced in IV.A, above, failing to monitor the transactions of each Legacy Restricted Client and newly onboarded Restricted Client (collectively, "Ongoing Restricted Clients"), if any, to determine whether the Restricted Client is engaged in practices that are deceptive or unfair in violation of Section 5 of the FTC Act. Such monitoring shall include, but not be limited to, regularly reviewing each Ongoing Restricted Client's Internet websites including from an IP address that is not associated with Defendant, regularly reviewing each Ongoing Restricted Client's Chargeback Rates and Total Return Rates (if Defendant proposes to provide Payment Processing services for ACH Debit or RCPO transactions), and reasons provided for these rates, as well as examining any unusual or suspect transaction patterns, values, and volume;

C.      Failing to calculate and update at least on a monthly basis for each Ongoing Restricted Client the Chargeback Rate and Total Return Rate (if Defendant proposes to provide Payment Processing services for ACH Debit or RCPO transactions).  For any Ongoing Restricted Client with multiple processing accounts, the calculation of the Chargeback Rate and Total Return Rate shall be made for each of the Restricted Client's individual processing accounts, and in the aggregate for each Restricted Client;

D.      Failing to promptly conduct a reasonable investigation of the cause of the Total Return Rates (if Defendant proposes to provide Payment Processing services for ACH Debit or RCPO transactions) or Chargeback Rates (a reasonable investigation includes, but is not limited to: verifying and updating the truth and accuracy of information gathered in compliance with Section III of this Order and any other advertising of the Ongoing Restricted Client; confirming that the Ongoing Restricted Client has obtained required consumer authorizations for the transactions; contacting Financial Institutions and Better Business Bureaus to gather detailed information, including complaints and other relevant information, regarding the Ongoing Restricted Client; reviewing from an IP address that is not associated with Defendant the Internet websites used by the Ongoing Restricted Client to market its goods and services; searching publicly available sources for legal actions taken by the Commission or other state or federal law enforcement agencies against the Ongoing Restricted Client; and conducting "test" shopping to determine the Ongoing Restricted Client sales practices, where possible) for:

1.      Any Ongoing Restricted Client whose Total Return Rate exceeds two and one-half percent (2.5%) and whose total number of ACH Debit or RCPO returned transactions in any month exceeds seventy-five (75) transactions;

2.      Any Restricted Client, whose monthly Chargeback Rate exceeds one percent (1%) and whose total number of Chargebacks exceeds seventy-five (75) per month in two of the past six months;

E.      Failing to stop processing sales transactions and close all processing accounts for any Ongoing Restricted Client investigated pursuant to Subsection D, above, within 60 days of commencing the investigation, unless Defendant drafts and submits to the Assessor (as defined in Section VI.A) a written report establishing facts that demonstrate, by clear and convincing evidence, that the Restricted Client's business practices related to the offer(s) for which Defendant provides Payment Processing are not deceptive or unfair in violation of Section 5 of the FTC Act and are not in violation of the Telemarketing Sales Rule; and

F.      Failing to immediately stop processing sales transactions and close all processing accounts for any Ongoing Restricted Client that Defendant knows or should know is engaged in tactics to avoid fraud and risk monitoring programs established by any Financial Institution, Acquirer, or the operators of any payment system, including, but not limited to, balancing or distributing sales transaction volume or sales transaction activity among multiple Merchant Accounts or merchant billing descriptors; splitting a single sales transaction into multiple smaller transactions, or using shell companies to apply for additional Merchant Accounts.

**V.**

**WHOLESALE ISO OVERSIGHT PROGRAM**

IT IS FURTHER ORDERED that Defendant must, no later than one hundred eighty (180) days after the effective date of this Order, establish a written oversight program for Wholesale ISOs (the "Wholesale ISO Oversight Program"), implement the program promptly with a completion date of three hundred sixty-five (365) days after the effective date of this Order (unless

extended by the Associate Director for Enforcement for good cause), and thereafter maintain the program. The Wholesale ISO Oversight Program shall provide that: (i) the underwriting of new Covered Clients by the Wholesale ISO is performed in compliance with the standards for Merchant underwriting programs, policies and practices established for Wholesale ISOs by Defendant, the Acquiring Bank(s) and card networks with respect to preventing unfair or deceptive acts or practices, including violations of the Telemarketing Sales Rule, or tactics to avoid fraud detection and monitoring by Covered Clients; (ii) the monitoring, investigation, and adverse action with respect to Covered Clients by the Wholesale ISO is performed in compliance with the standards for the monitoring, investigation, and adverse action programs, policies, and practices established for Wholesale ISOs by Defendant, the Acquiring Bank(s), and the card networks with respect to detecting unfair or deceptive acts or practices, violations of the Telemarketing Sales Rule, or tactics to avoid fraud detection and monitoring by Covered Clients; and (iii) Defendant takes timely remedial action in the event that the Wholesale ISO's practices are deficient with respect to (i) or (ii), above. To satisfy this requirement, Defendant must, at a minimum:

A.      Establish and implement a reasonable methodology for assessing risk levels of each Wholesale ISO's Merchant portfolio, including an assessment of whether Covered Clients in each portfolio are likely to engage in unfair or deceptive acts or practices, violations of the Telemarketing Sales Rule, or tactics to avoid fraud monitoring programs.

B.      Perform a risk assessment for each Wholesale ISO.

C.      Perform a risk assessment for each prospective Wholesale ISO before Defendant and the Acquiring Bank provide Payment Processing for the Wholesale ISO's Covered Clients.

D.      Assign Wholesale ISO risk ratings to current and prospective Wholesale ISOs. The Wholesale ISO risk rating assignment process shall include written procedures for timely reviewing

and modifying the risk rating as additional information is received concerning the Wholesale ISO's Covered Clients and their Payment Processing activity.

      E.      Establish and enforce policies and procedures for oversight of Wholesale ISO's performance of underwriting, monitoring (including oversight of the Wholesale ISO's monitoring of Covered Clients' marketing materials and websites), investigation, and adverse action as determined by the relevant risk rating. Such policies and procedures shall include, for example and as appropriate for a Wholesale ISO based on the risk rating: (1) routine reviews of overall Chargeback incidence and periodic audits of Wholesale ISO underwriting, monitoring, investigation, and adverse action policies and procedures; (2) intensive "shadow monitoring" and post-onboarding sampling of new Covered Client applications; (3) review and prior approval of all new Covered Clients and direct performance of all monitoring (including reviews of marketing materials and websites), investigation, and adverse action with respect to Covered Clients; or (4) termination of the Wholesale ISO relationship or the Covered Clients in an identifiable segment.

      F.      Establish and enforce policies and procedures for each Wholesale ISO to create, maintain, and implement written policies and procedures that meet the standards established for Wholesale ISOs by Defendant, the Acquiring Bank, and the credit card networks. These policies and procedures must identify and describe in detail: (1) prohibited and restricted merchant categories; (2) merchant application and agreement requirements; (3) merchant underwriting requirements, including merchant site and website inspections, (4) merchant account approval authority procedures; (5) transaction monitoring requirements; (6) merchant investigation, termination, and adverse action thresholds and procedures; and (7) sales agent oversight policies and procedures.

G.      Establish and enforce policies and procedures that Defendant review for each Wholesale ISO on a monthly basis key risk metrics, including, but not limited to, monthly sales, Chargeback, and refund counts, amounts, and rates for: (1) the Wholesale ISO's merchant portfolio; (2) Sales Agents that have referred Covered Clients to the Wholesale ISO that have average Chargeback Rates that exceed 0.75% and whose total number of Chargebacks exceeds seventy-five (75) per month; and (3) each Covered Client whose monthly Chargeback Rate exceeds 0.75% and whose total number of Chargebacks exceeds seventy-five (75) per month. To the extent key risk metric data is not already in Defendant's possession, Defendant shall require the Wholesale ISO to report such data.

H.      For any Wholesale ISO whose aggregate Merchant processing activity generates a monthly Chargeback Rate that exceeds 0.75% and whose total number of Chargebacks exceeds seven hundred and fifty (750) per month, Defendant shall promptly: (1) conduct a reasonable investigation of the cause of the elevated Chargeback Rate; (2) stop processing sales transactions and close processing accounts for those Covered Clients, if any, that the investigation indicated may have engaged in unfair or deceptive acts or practices, violations of the Telemarketing Sales Rule) or tactics to avoid fraud monitoring programs, and (3) require that the Wholesale ISO promptly remediate any deficiencies in underwriting or monitoring practices related to the elevated Chargeback Rate. Within 60 days of commencing the investigation, the Defendant shall submit to the Assessor (as defined in Section VI.A) a written report of the investigation, supported by evidence, of the cause or causes of the elevated Chargeback Rate, including whether there was evidence that Covered Clients were engaged in deceptive or unfair practices in violation of Section 5 of the FTC Act or the Telemarketing Sales Rule, the responsibility of the Wholesale ISO for the elevated Chargeback Rate, and the remedial measures conducted or to be conducted by the

Wholesale ISO. The report shall also discuss any changes in the risk rating for the Wholesale ISO as a result of the elevated Chargeback Rate and investigation findings, and the measures that Defendant is taking to increase oversight of the Wholesale ISO pursuant to the policies established in Subsection E, above.

I.        Establish, document, and implement criteria for assigning levels of risk with respect to Covered Clients in Wholesale ISO portfolios. The criteria may include factors such as the activities and industries identified as "unqualified" or "high risk" by the Acquiring Bank, a card network, or the Defendant; the percentages of Card-Not-Present Transactions; presence of Telemarketing activity; anticipated and actual Chargeback Rates; transaction volumes; or other available data that, alone or in combination, would enhance the predictability that a Covered Client may be or may become engaged in practices that are deceptive or unfair in violation of Section 5 of the FTC Act, the Telemarketing Sales Rule, or engaged in tactics to avoid fraud monitoring programs. The criteria shall be reviewed at least annually and updated as appropriate to take into account changes in techniques or patterns of Covered Clients who engage in practices that are deceptive or unfair in violation of Section 5 of the FTC Act, the Telemarketing Sales Rule, or engaged in tactics to avoid fraud monitoring programs.

J.        Ensure that Covered Clients whose processing activity generates Chargeback Rates that exceed the acceptable limits as set forth by the programs, policies, and practices established by Defendant, the Acquiring Bank, and the credit card networks are timely escalated, investigated, and appropriately dispositioned.

K.        Designate a qualified employee or employees to coordinate, oversee, and be responsible for the Wholesale ISO Oversight Program.

**VI.**

## INDEPENDENT ASSESSMENT OF THE
## WHOLESALE ISO OVERSIGHT PROGRAM

IT IS FURTHER ORDERED that, in connection with its compliance with Section V of this

Order titled Wholesale ISO Oversight Program, Defendant must obtain (i) an initial assessment to

be conducted in two or three phases (as detailed in Section VI.I-M) (the "Initial Assessment"); and

(ii) two additional annual assessments (as detailed in Section VI.N-P) (the "Annual Assessments")

to be conducted beginning twelve months after the completion of the initial assessment and first

annual assessment, respectively:

A.      The Initial and Annual Assessments must be obtained from an objective, independent

third-party professional (the "Assessor") who has at least five (5) years of experience with respect

to merchant fraud prevention and detection programs, third-party oversight programs, Payment

Processor risk management, or a similar background.  The Assessor must be a person or entity

authorized by Visa at the time of the assessment to conduct Visa Global Acquirer Risk Standards

("GARS") compliance reviews or authorized by Mastercard to conduct Customer Risk Reviews.

No later than thirty (30) days after the entry of this Order, Defendant shall provide the Associate

Director of the Division of Marketing Practices for the Bureau of Consumer Protection at the

Federal Trade Commission with the name and affiliation of the proposed Assessor selected to

conduct the Assessments (along with the Assessor's proposed statement of work) which the

Associate Director shall have the authority to approve in his or her sole discretion.   If the Associate

Director of the Division of Marketing Practices does not approve the proposed Assessor Defendant

has selected, Defendant must choose a person or entity to conduct the Assessment from a list of at

least three potential Assessors provided by a representative of the Commission within fourteen

(14) days after receiving the list.

-19-

B.      The Assessor shall conduct an independent review of Defendant's Wholesale ISO Oversight Program, and shall be contractually required to retain all documents relevant to each Assessment for five (5) years after completion of such Assessment, and to provide such documents to the Commission and adequately respond to questions by the Commission within fourteen (14) days of receipt of a written request from a representative of the Commission.   No documents or responses to questions may be withheld by the Assessor in response to such requests on the basis of (i) a claim of confidentiality, proprietary or trade secrets, or any similar claim, or (ii) any privilege asserted between Defendant and the Assessor, although such documents can be designated for confidential treatment in accordance with applicable law.

C.      The Assessor is authorized to choose, engage, and employ attorneys, investigators, accountants, appraisers, and other independent contractors and technical specialists, as the Assessor deems advisable or necessary in the performance of the Assessor's duties and responsibilities under the authority granted by this Order.

D.      The Assessor shall have access to all information, documents, personnel, and premises in the possession, custody, or control of Defendant that the Assessor deems necessary to carry out the Assessor's duties pursuant to this Order, and Defendant shall use its best efforts to obtain information from Wholesale ISOs that the Assessor deems necessary to carry out the Assessor's duties pursuant to this Order; *provided that*, the Assessor shall make reasonable efforts to avoid imposing upon Defendant undue costs and burden; and *provided that*, if there is a dispute about the Assessor's access to Defendant's information, documents, personnel, and premises, after attempting to resolve the dispute without court action and for good cause shown, Defendant or the Assessor may file a motion with this Court seeking appropriate relief.

E.      The Assessor shall prepare a budget and work plan as follows:

-20-

1.      The scope of work, fees, and expenses to be incurred by the Assessor and any professional staff shall be reasonable and not excessive, in light of the Assessor's defined duties, responsibilities, and powers prescribed in this Order.

2.      No later than sixty (60) days after the date the Assessor is selected or chosen by the Defendant, the Assessor shall, in consultation with Commission staff and Defendant, prepare and present to Commission staff and Defendant a budget and work plan for each Phase of the Initial Assessment (the "Assessor's Initial Budget") describing the scope of work to be performed and the fees and expenses of the Assessor and any professional staff to be incurred through completion of the Initial Assessment.

3.      The Assessor shall prepare and submit to Defendant and to Commission staff a budget for the first and second Annual Assessments no later than 90 days before the start date of the assessment (the "Assessor's Annual Budget"). If Defendant and Commission staff both approve the Assessor's Annual Budget, the Assessor shall adhere to and not exceed the approved Assessor's budget unless such deviations are authorized by agreement of the parties or order of the Court.

4.      Within twenty-one (21) days of receipt of the Assessor's Initial Budget and any Assessor's Annual Budget, either Commission staff or Defendant may serve an objection to the Assessor, who, within twenty-one (21) days of such objection, shall provide to Commission staff and Defendant a revised Assessor's Initial or Annual Budget, or a notice that no such revision will be made.

5.      Following the Assessor's response to an objection provided in accordance with VI.E.4, either Commission staff or Defendant may apply to the Court to modify the Assessor's Budget.

6.      Pending the Court's decision concerning any application pursuant to VI.E.4, the Assessor shall continue to perform its duties and implement the Assessor's Initial or Annual Budget as prepared by the Assessor.

7.      The Assessor shall provide Defendant with an accounting and a request for payment of reasonable compensation every six (6) months, or at intervals deemed appropriate by the Assessor.

F.      If the Assessor is no longer willing or able to continue to serve, or if the Court relieves the Assessor of his duties at the request of the FTC, a replacement Assessor shall be chosen according to the procedures in VI.A.  The overall term of the Assessor set forth in Subsection H of this Section shall be extended to the extent that the absence of the Assessor delays the initiation or completion of the Initial Assessment or an Annual Assessment.  In the event of the appointment of a replacement Assessor, the replacement Assessor shall have all the rights, powers, duties, and obligations of the Assessor under this Order.

G.      Defendant shall indemnify the Assessor and hold the Assessor harmless against all losses, claims, damages, liabilities, or expenses arising out of, or in connection with, the performance of the Assessor's duties, including all reasonable fees of counsel and other reasonable expenses incurred in connection with the preparations for, or defense of, any claim, whether or not resulting in any liability, except to the extent that such losses, claims, damages, liabilities, or expenses result from gross negligence, willful or wanton acts, or bad faith by the Assessor.

H.      The reporting period for the Assessments must cover: (i) for the Initial Assessment, the first year after the effective date of the Order; and (ii) for the following two Annual Assessments, each annual period thereafter.

I.      Phase I of the Initial Assessment must:

1.      Review whether the elements of, and the methodologies, policies and procedures adopted pursuant to, the Wholesale ISO Oversight Program satisfactorily incorporate the applicable standards set forth in Section V of this Order concerning underwriting, monitoring, investigation, and adverse action with respect to Wholesale ISOs and Covered Clients;

2.      Identify gaps or weaknesses in elements of, and the methodologies, policies and procedures adopted pursuant to, the Wholesale ISO Oversight Program; and

3.      Make recommendations for remediating the identified gaps or weaknesses.

J.      Phase I of the Initial Assessment shall be completed and the Assessor shall issue a Phase I report no later than eight (8) months after the effective date of this Order, unless the Associate Director for Enforcement grants an extension of the deadline for establishment of the program set forth in Section V, above, for good cause.

K.      Phase II of the Initial Assessment must:

1.      Evaluate whether Defendant has implemented and maintained the methodologies, policies and procedures encompassed in the Wholesale ISO Oversight Program required by Section V of this Order, including the recommendations identified by the Assessor in its Phase I report;

2.      Assess Defendant's compliance with Visa's Third-party Agent Due Diligence Risk Standards, Visa GARS, and Mastercard service provider requirements to the extent relevant to the Wholesale ISO Oversight Program;

3.      Assess the effectiveness of Defendant's implementation and maintenance of, and the methodologies, policies and procedures adopted pursuant to, the Wholesale ISO Oversight Program; and

4.      Identify gaps or weaknesses, if any, in the Wholesale ISO Oversight Program and related methodologies, policies and procedures as implemented; and make recommendations to remediate or cure any such gaps and weaknesses.

L.      Phase II of the Initial Assessment shall be initiated when Defendant notifies the Independent Assessor that the Wholesale ISO Oversight Program has been substantially implemented, but no later than twelve (12) months of the effective date of this Order, unless the Assessor grants an extension of the implementation deadline set forth in Section V, above, for good cause. Phase II shall be completed and a report issued within two (2) months of Defendant's notification of substantial implementation.

M.      Phase III of the Initial Assessment shall be conducted if the Assessor identifies gaps or weaknesses in Phase II, as specified in Section VI.K.4, and shall consist of a review of Defendant's remediation of gaps and weaknesses identified in Phase II and Defendant's implementation of resulting recommendations. Phase III shall be conducted beginning thirty (30) days after Defendant notifies the Assessor that it has substantially implemented the Assessor's recommendations, but no later than three (3) months after completion of the Phase II report, unless the Assessor grants an extension for good cause. The Assessor must provide a final Initial Assessment report to Defendant and the FTC within sixty (60) days of the start of Phase III of the Initial Assessment identifying recommendations that were implemented and evidence used to validate recommendation implementation, as well as any recommendations that were not implemented, and Defendants' response thereto.

N.      Phase I of the Annual Assessments must:

1.      Evaluate whether Defendant has continued to implement and maintain the methodologies, policies and procedures encompassed in the Wholesale ISO Oversight Program;

-24-

2.      Assess the effectiveness of Defendant's continued implementation and maintenance of, and the methodologies, policies and procedures adopted pursuant to, the Wholesale ISO Oversight Program;

3.      Review any modifications made by Defendant to elements of, or the methodologies, policies and procedures adopted pursuant to, the Wholesale ISO Oversight Program to ascertain whether they continue to satisfactorily incorporate the standards set forth in Section V of this Order; and

4.      Identify gaps or weaknesses, if any, in the Wholesale ISO Oversight Program, including, to the extent relevant to the Wholesale ISO Oversight Program, an assessment of compliance with Visa's Third-party Agent Due Diligence Risk Standards, Visa GARS, and Mastercard service provider requirements; and make recommendations to remediate or cure any such gaps and weaknesses.

O.      Phase I of the Annual Assessments shall be completed and a report issued within sixty (60) days after the start of Phase I of the Annual Assessment.

P.      Phase II of the Annual Assessments shall be conducted if the Assessor identifies gaps or weaknesses in Phase I, as specified in Section VI.N.4, and shall consist of a review of Defendant's responsiveness in remediating such gaps or weaknesses, and Defendant's implementation of resulting recommendations. Phase II shall be conducted beginning thirty (30) days after Defendant notifies the Assessor that to the Assessor's recommendations were implemented, but no later than three (3) months after completion of the Phase I report, unless the Assessor grants an extension for good cause. Within sixty (60) days after the start of a Phase II review, the Assessor must provide to Defendant and the FTC a final Annual Assessment report for that reporting period, including identifying recommendations that were implemented and evidence

used to validate recommendation implementation, as well as any recommendations not implemented, and any gaps or weaknesses previously identified that remain unresolved.

Q.     With respect to the Initial and Annual Assessments, the Assessor shall identify specific evidence (including, but not limited to, documents reviewed, sampling and testing performed, and interviews conducted) examined to make such determinations, assessments, and identifications, and explain why the evidence that the Assessor, as applicable, examined is sufficient to justify the Assessor's findings, as applicable. The Assessments shall be signed by the Assessor and shall state that the Assessor conducted an independent review of the Wholesale ISO Oversight Program and did not rely solely on assertions or attestations by Defendant's management.

R.     Unless otherwise directed by a Commission representative in writing, Defendant must submit the report of each Assessment to the Commission within ten (10) days after the report of the Assessment has been completed via email to DEbrief@ftc.gov or by overnight courier (not the U.S. Postal Service) to Associate Director, Division of Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin, "Federal Trade Commission v. First Data Merchant Services LLC, Matter No. 1623180." Defendant must notify the Commission of any portions of the Assessment containing trade secrets, commercial or financial information, or information about a consumer or other third party, for which confidential treatment is requested pursuant to the Commission's procedures concerning public disclosure set forth in 15 U.S.C. § 46(f) and 16 CFR 4.10.

## VII.

### COOPERATION WITH ASSESSOR

IT IS FURTHER ORDERED that Defendant, Defendant's officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with any Assessment required by Section VI of this Order titled Independent Assessment of the Wholesale ISO Oversight Program, must not withhold any material facts from the Assessor, and must not misrepresent, expressly or by implication, any material fact.

## VIII.

### ANNUAL CERTIFICATION

IT IS FURTHER ORDERED that, in connection with compliance with Section V of this Order titled Wholesale ISO Oversight Program, Defendant shall:

A.     For a total of three years, commencing one (1) year after the effective date of this Order, and each year thereafter until the fourth anniversary of the effective date of this Order, provide the Commission with a certification from a senior employee or a senior management committee of Defendant responsible for regulatory compliance or overall management of Defendant's Wholesale ISO line of business, that: (1) Defendant has established, implemented, and maintained the requirements of this Order; (2) Defendant is not aware of any material noncompliance that has not been (a) corrected or (b) disclosed to the Commission; (3) Defendant has cooperated with the Assessor as required by Section VII of this Order; and (4) for certifications filed for periods following the completion of the last Annual Assessment, that the Defendant has not (a) made material changes in the Wholesale ISO Oversight Program, (b) modified related methodologies, policies, and procedures, or (c) materially reduced financial support for the program that alone or

in combination could reasonably be expected to diminish the effectiveness of the Wholesale ISO Oversight Program.   Each certification issued pursuant to this Section VIII must be based on the personal knowledge of the senior corporate manager, senior officer, or subject matter experts whom the board of directors, or relevant subcommittee thereof, or other equivalent governing body, reasonably relies upon in making the certification.

B.        Unless otherwise directed by a Commission representative in writing, submit all annual certifications to the Commission pursuant to this Order via email to DEbrief@ftc.gov or by overnight courier (not the U.S. Postal Service) to Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue N.W., Washington, D.C. 20580.   The subject line must begin, "Federal Trade Commission v. First Data Merchant Services LLC, Matter No. 1623180."

## IX.

## MONETARY JUDGMENT

IT IS FURTHER ORDERED that:

A.        Judgment in the amount of Forty Million Dollars ($40,000,000)  is entered in favor of the Commission against Defendant.

B.        Defendant is ordered to pay to the Commission Forty Million Dollars ($40,000,000).  Such payment must be made within seven (7) days of entry of this Order by electronic fund transfer in accordance with instructions previously provided by a representative of the Commission.

## X.

## ADDITIONAL MONETARY PROVISIONS

IT IS FURTHER ORDERED that:

A.      Defendant relinquishes dominion and all legal and equitable right, title, and interest in all assets transferred pursuant to this Order and may not seek the return of any assets.

B.      The facts alleged in the Complaint will be taken as true, without further proof, in any subsequent civil litigation by or on behalf of the Commission in a proceeding to enforce its rights to any payment or monetary judgment pursuant to this Order, such as a nondischargeability complaint in any bankruptcy case.

C.      The facts alleged in the Complaint establish all elements necessary to sustain an action by the Commission pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A), and this Order will have collateral estoppel effect for such purposes.

D.      Defendant acknowledges that its Taxpayer Identification Numbers (Social Security Number or Employer Identification Number), which Defendant must submit to the Commission, may be used for collecting and reporting on any delinquent amount arising out of this Order, in accordance with 31 U .S.C. § 7701.

E.      All money paid to the Commission pursuant to this Order may be deposited into a fund administered by the Commission or its designee to be used for equitable relief, including consumer redress and any attendant expenses for the administration of any redress fund. If a representative of the Commission decides that direct redress to consumers is wholly or partially impracticable or money remains after redress is completed, the Commission may apply any remaining money for such other equitable relief (including consumer information remedies) as it determines to be reasonably related to Defendant's practices alleged in the Complaint. Any money not used for such equitable relief is to be deposited to the U.S. Treasury as disgorgement. Defendants have no right to challenge any actions the Commission or its representatives may take pursuant to this Subsection.

## XI.

### CONSUMER INFORMATION

IT IS FURTHER ORDERED that Defendant, and Defendant's officers, agents, employees, representatives, and all others in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from directly or indirectly failing to provide sufficient customer information to enable the Commission to efficiently administer consumer redress. If a representative of the Commission requests in writing any information related to redress, Defendant must provide it, in the form prescribed by the Commission, within fourteen (14) days.

## XII.

### COOPERATION

IT IS FURTHER ORDERED that Defendant must fully cooperate with representatives of the Commission in this case and in any investigation related to or associated with the transactions or the occurrences that are the subject of the Complaint. Defendant must provide truthful and complete information, evidence, and testimony. Defendant must cause officers, employees, representatives, or agents to appear for interviews, discovery, hearings, trials, and any other proceedings that a Commission representative may reasonably request upon five (5) days written notice, or other reasonable notice, at such places and times as a Commission representative may designate, without the service of a subpoena.

## XIII.

### ORDER ACKNOWLEDGMENTS

IT IS FURTHER ORDERED that Defendant obtain acknowledgments of receipt of this Order:

A.      Defendant within seven (7) days of entry of this Order must submit to the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B.      For five (5) years after entry of this Order, Defendant, for any business that Defendant is the majority owner or directly or indirectly controls, must deliver a copy of this Order to: (1) all principals, officers, directors and LLC members and managers; (2) all employees, agents and representatives having managerial responsibilities for conduct related to the subject matter of the Order; and (3) any business entity resulting from any change in structure as set forth in Section XIV.B.2 of this Order titled Compliance Reporting.  Delivery must occur within seven (7) days of entry of this Order for current personnel.  For all others, delivery must occur before they assume their responsibilities.

C.      From each individual or entity to which Defendant delivered a copy of this Order, Defendant must obtain, within thirty (30) days, a signed and dated acknowledgment of receipt of this Order.

## XIV.

### COMPLIANCE REPORTING

IT IS FURTHER ORDERED that Defendant make timely submissions to the Commission:

A.      One (1) year after entry of this Order, Defendant must submit a compliance report, sworn under penalty of perjury, which must: (1) identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the Commission may use to communicate with Defendant; (2) identify all of Defendant's businesses involved in Wholesale ISO oversight by all of their names, telephone numbers, and physical, postal, email, and Internet addresses; (3) describe the activities of each such business, including the goods and services offered; (4) describe in detail whether and how that Defendant is in

-31-

compliance with each Section of this Order; and (5) provide a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the Commission.

B.     For three (3) years after entry of this Order, Defendant must submit a compliance notice, sworn under penalty of perjury, within fourteen (14) days of any change in the following: (1) any designated point of contact; or (2) the structure of Defendant or any entity Defendant has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including: creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

C.     Defendant must submit to the Commission notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against Defendant within fourteen (14) days of its filing.

D.     Any submission to the Commission required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. §1746 such as by concluding: "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on: " and supplying the date, signatory's full name, title (if applicable), and signature.

E.     Unless otherwise directed by a Commission representative in writing, and except as stated in Section VI.A, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin: FTC v. First Data Merchant Services LLC, Matter No. 1623180.

## XV.

## RECORDKEEPING

IT IS FURTHER ORDERED that Defendant must create certain records for three (3) years after entry of the Order, and retain each such record for five (5) years. Specifically, Defendant, in connection with the operation of the Wholesale ISO Oversight Program, must create and retain the following records:

A.     Accounting records showing the revenues for all goods and services sold with respect to Wholesale ISOs.

B.     The written Wholesale ISO Oversight Program document, and methodologies, policies, and procedures created in connection with the Wholesale ISO Oversight Program, including amendments thereto.

C.     Personnel records showing, for each person with managerial responsibilities with respect to the Wholesale ISO Oversight Program, whether as an employee or otherwise, that person's name; addresses; telephone numbers; job title or position; dates of service; and (if applicable) the reason for termination.

D.     All records necessary to demonstrate full compliance with each provision of this Order, including all submissions to the Commission.

## XVI.

## COMPLIANCE MONITORING

IT IS FURTHER ORDERED that, for the purpose of monitoring Defendant's compliance with this Order:

A.     Within fourteen (14) days of receipt of a written request from a representative of the Commission, Defendant must: submit additional compliance reports or other requested

information, which must be sworn under penalty of perjury; appear for depositions; and produce documents for inspection and copying. The Commission is also authorized to obtain discovery, without further leave of court, using any of the procedures prescribed by Federal Rules of Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45, and 69.

B.    For matters concerning this Order, the Commission is authorized to communicate directly with the Defendant.  Defendant must permit representatives of the Commission to interview any employee or other person affiliated with Defendant who has agreed to such an interview. The person interviewed may have counsel present.

C.    The Commission may use all other lawful means, including posing, through its representatives as consumers, suppliers, or other individuals or entities, to Defendant or any individual or entity affiliated with Defendant, without the necessity of identification or prior notice. Nothing in this Order limits the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-l.

**XVII.**

**RETENTION OF JURISDICTION**

IT IS FURTHER ORDERED that this Court retains Jurisdiction of this matter for purposes of construction, modification, and enforcement of this Order.

SO ORDERED this **20**th day of **May**_____, 2020.

_____

Louis L. Stanton

UNITED STATES DISTRICT JUDGE

-34-

**SO STIPULATED AND AGREED:**


**FOR PLAINTIFF:**

**FEDERAL TRADE COMMISSION**


Date: 5/19/2020

Nicholas M. May
Anna M. Burns
Michael A. Boutros
Federal Trade Commission
Southeast Region
225 Peachtree Street NE, Suite 1500
Atlanta, GA 30303
(404) 656-1360; nmay@ftc.gov
(404) 656-1350; aburns@ftc.gov
(404) 656-1351; mboutros@ftc.gov

**FOR DEFENDANT**

**FIRST DATA MERCHANT SERVICES LLC:**

_____
Frank J. Bisignano
Chief Executive Officer

Date: 1/6/20

_____
Alexander J. Willscher
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
(212) 558-4000;
willschera@sullcrom.com

Date: April 10, 2020

Judson O. Littleton
Stephen H. Meyer
Sullivan & Cromwell LLP
1700 New York Avenue, Suite 700
Washington, DC 20006
(202) 956-7500; littletonj@sullcrom.com
meyerst@sullcrom.com

Michael C. Keats
Una A. Dean
Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza,
New York, NY 10004
(212) 859-8000; michael.keats@friedfrank.com
Una.Dean@friedfrank.com.